**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| CURTIS W. ACTON, Derivatively on Behalf of Nominal Defendant TIERONE CORPORATION, | ) ) ) ) ) | CASE NO. _____ |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| JAMES A. LAPHEN, GILBERT G., LUNDSTROM, MICAHEL FALBO, CHARLES W. HOSKINS, CAMPBELL R. MCCONNELL, JOYCE PERSON POCRAS, SAMUEL BAIRD, JAMES MCCLURG, and JAMES STRAND, | ) ) ) ) ) ) ) ) | COMPLAINT AND DEMAND FOR JURY TRIAL |
| Defendants, | ) ) ) | |
| and | ) ) ) | |
| TIERONE CORPORATION, | ) ) ) | |
| Nominal Defendant. | ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff by the undersigned attorneys, submits this Verified Shareholder Derivative Complaint on behalf of nominal defendant TierOne Corporation ("TierOne" or the "Company") against the defendants named herein.

## SUMMARY OF THE ACTION

1.     Plaintiff brings this action derivatively for the benefit of TierOne Corporation ("TierOne" or the "Company") against certain members of TierOne's Board of Directors (the "Board") and certain of its executive officers seeking to remedy Individual Defendants' (defined *infra*) breaches of fiduciary duties, abuse of control, gross mismanagement and waste of

corporate assets that occurred from March 3, 2008 to the present (the "Relevant Period")[1] that have caused substantial damages to TierOne.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

3.     This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

4.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a) because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this District. One or more of the Defendants either resides in or maintains executive offices in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## PARTIES

### Plaintiff

5.     Plaintiff Acton is, and was, a shareholder of TierOne during relevant times herein. Plaintiff Acton is a resident of the State of Florida.

### Individual Defendants

6.     Defendant James A. Laphen ("Laphen") has served as President, Chief Operating Officer of TierOne, and director of the Company since 2002.  Since March 30, 2010, Laphen has also served as the acting Chief Executive Officer ("CEO") of TierOne.  Upon reason and belief,

---

[1] The Relevant Period continues through the present as Defendants have failed to take action to correct the breaches of fiduciary duties alleged herein.

Laphen is a citizen of the State of Nebraska.

7.     Defendant Gilbert G. Lundstrom ("Lundstrom") served as CEO and Chairman of the Board since 2002. Lundstrom resigned his positions on January 28, 2010 but remained as Vice Chairman of the Board from January 28, 2010 until his resignation on March 30, 2010. Upon reason and belief, Lundstrom is a citizen of the State of Nebraska.

8.     Defendant Michael Falbo ("Falbo") served as the Company's CEO and Chairman of the Board from January 28, 2010 until his resignation on March 30, 2010. Upon reason and belief, Falbo is a citizen of the State of Wisconsin.

9.     Defendant Charles W. Hoskins ("Hoskins") has served as a director of TierOne since 2008 and was named acting Chairman of the Board on March 30, 2010. Hoskins also serves as Chairman of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee. Upon reason and belief, Hoskins is a citizen of the State of Virginia.

10.     Defendant Campbell McConnell ("McConnell") has served as a director of TierOne since 2002. McConnell serves on the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee. Upon reason and belief, McConnell is a citizen of the State of Nebraska.

11.     Defendant Joyce Person Pocras ("Pocras") has served as a director of TierOne since 2002. Pocras serves on the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee. Upon reason and belief, Pocras is a citizen of the State of Nevada.

12.     Defendant Samuel Baird ("Baird") served as a director of TierOne from September 2008 until his resignation on March 30, 2010. Baird served as one of three members of the

Special Litigation Committee that refused Plaintiff Acton's demand. Upon reason and belief, Baird is a citizen of the State of Nebraska.

13.     Defendant James McClurg ("McClurg") has served as a director of TierOne from July 2009 until his resignation on March 30, 2010. McClurg served as one of three members of the Special Litigation Committee that refused Plaintiff Acton's demand. Upon reason and belief, McClurg is a citizen of the State of New York.

14.     Defendant James Strand ("Strand") has served as a director of TierOne from July 2009 until his resignation on March 30, 2010. Strand served as one of three members of the Special Litigation Committee that refused Plaintiff Acton's demand. Upon reason and belief, Strand is a citizen of the State of California.

15.     Collectively, Laphen, Lundstrom, Falbo, Hoskins, McConnell, Pocras, Baird, McClurg, and Strand are referred to herein as the "Individual Defendants."

**Nominal Defendant**

16.     Nominal Defendant TierOne is a Wisconsin corporation with its principal executive offices located in Nebraska. TierOne operates as the holding company for TierOne Bank, which provides a range of consumer, commercial, and agricultural banking products and services in the United States. TierOne is the parent holding company for TierOne Bank.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

17.     By reason of their positions as officers, directors, and/or fiduciaries of TierOne and because of their ability to control the business and corporate affairs of TierOne, the Individual Defendants owed TierOne and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage TierOne in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act

4

in furtherance of the best interests of TierOne and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to TierOne and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

18.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of TierOne, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with TierOne, each of the Individual Defendants had knowledge of material nonpublic information regarding the Company.

19.     To discharge their duties, the officers and directors of TierOne were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of TierOne were required to, *inter alia*:

(a)     in good faith, manage, conduct, supervise and direct the business and affairs of TierOne carefully and in good faith in accordance with state and federal laws and regulations and the articles and by-laws of TierOne;

(b)     exercise reasonable control and supervision over the officers and employees of TierOne;

(c)     exercise reasonable care and good faith in evaluation of the prudence and soundness of policies and practices proposed to be undertaken by TierOne;

(d)     ensure that TierOne did not engage in unsafe, imprudent or unsound practices and

that TierOne complied with all applicable laws and regulations;

(e)     establish guidelines and policies adequately governing the structure and organization of the Company's operations;

(f)     establish guidelines and policies adequately governing TierOne's accounting practices;

(g)     maintain a proper division of authority and responsibility among the officers and directors of TierOne so as to prevent the dominance of any officer or director in the conduct of the business and affairs of TierOne;

(h)     ensure that TierOne did not engage in unsafe, imprudent or unsound practices and to become and remain informed as to how TierOne was, in fact, operating;

(j)     maintain and implement an adequate and functioning system of internal financial and accounting controls and management information systems, such that TierOne's assets would be safeguarded, its financial statements and information would be accurately maintained and implement an adequate and functioning system of internal financial and accounting controls and management information systems, in order to ensure that TierOne's assets would be safeguarded and its financial statements and information would be accurately disseminated;

(k)     supervise the preparation and filing of financial results and financial statements required by law from TierOne, including the Company's Reports on Form 10-K, and to examine and evaluate any reports of examination, audits, or other information required by law concerning the financial condition of TierOne and to make full and accurate disclosure of all material facts concerning, among other things, each of the subjects and duties set forth above.

**Duties of the Company's Audit Committee**

20.     The Audit Committee members were responsible for maintaining and establishing

adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.

21.    According to the Company's Audit Committee Charter, the Audit Committee has, *inter alia*, the following responsibilities: i) review and discuss with management and the independent auditors the audited annual financial statements and quarterly financial statements of the Company to be included in the Company's Annual Report on Form 10-K or 10-Q; ii) review disclosures made by the CEO and CFO during the Forms 10-K and 10-Q certification process about significant deficiencies in the design or operation of internal controls or any fraud that involves management or other employees who have a significant role in the Company's internal controls; iii) discuss the Company's earnings press releases, as well as financial information and any earnings guidance provided to analysts and rating agencies; iv) review management's assessment of the effectiveness of internal controls as of the end of the most recent fiscal year; and v) review findings of any examination by regulatory agencies such as the Federal Reserve, FDIC, Office of Thrift Supervision or the SEC.

## AIDING AND ABETTING AND CONCERTED ACTION

22.    In committing the wrongful acts alleged herein, Defendants have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

23.    The purpose and effect of Defendants' common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, corporate waste and unjust enrichment, to conceal adverse information concerning the Company's operation and financial condition and to artificially inflate the price of TierOne common stock so they could dispose of millions of dollars of their own

TierOne shares, and enhance their executive and directorial positions and receive the substantial compensation they obtained as a result thereof.

24.    Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully and/or recklessly engage in the scheme alleged herein and misrepresent TierOne's financial results. Each of the Defendants was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

25.    Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### The Company's Unsafe Lending Practices

26.    On March 3, 2008, the Company issued a press release announcing its financial results for the fourth quarter of 2007 and for fiscal year 2007.   The press release stated, in pertinent part:

> TierOne Corporation (NASDAQ-GSM: TONE) ("Company"), the holding company for TierOne Bank ("Bank"), reported a net loss of $18.0 million, or $1.05 per diluted share, for the three months ended December 31, 2007 compared to net income of $10.9 million, or $0.63 per diluted share, for the three months ended December 31, 2006.
>
> For the fiscal year ended December 31, 2007, the Company reported a net loss of $12.1 million, or $0.70 per diluted share, compared to net income for the year ended December 31, 2006 of $41.3 million, or $2.41 per diluted share.

The results for the three- and twelve-month periods ended December 31, 2007 were primarily impacted by provisions for loan losses of $38.9 million and $68.1 million recorded for each respective period compared to $1.8 million and $6.1 million for the same periods in 2006. The provisions for loan losses recorded during 2007 were primarily attributable to an increase in nonperforming residential construction, land development and commercial construction loans.

"Unprecedented pressures on the nation's equity, housing, credit and economic markets in 2007 have significantly impacted much of the financial sector and TierOne has not been immune to these issues," said Gilbert G. Lundstrom, chairman and chief executive officer. "We have taken a number of steps to address these challenges and will continue to adjust our business model as the current economic conditions warrant."

27.     On March 11, 2008, the Company filed its Form 10-K with the SEC.  The Form 10-K was signed by Defendants Lundstrom, Laphen, McConnell, Pocras, and Hoskins and primarily reiterated the information announced in TierOne's March 3, 2008 press release.  The Form 10-K also falsely states that the Company's internal controls were effective.

28.     On May 9, 2008, the Company issued a press release announcing its financial results for the first quarter of 2008.  The press release stated, in pertinent part:

TierOne Corporation (NASDAQ: TONE) ("Company"), the holding company for TierOne Bank ("Bank"), announced today it had recorded a $42.1 million, or $2.49 per diluted share, non-cash goodwill impairment charge to the Company's first quarter 2008 earnings. The charge, which was required under generally accepted accounting principles, has no impact on the Company's liquidity, cash flows or regulatory capital and is in response to the on-going volatility in the financial industry and the overall impact this volatility has had on market prices of most banking stocks.

In preparation for sale of all the nonperforming loans previously originated by Florida-based TransLand Financial Services ("TransLand"), the Bank recorded a $14.5 million provision for loan losses, wrote down the fair value of the remaining nonperforming TransLand portfolio and is working with an investment banking firm that specializes in the sale of mortgage and consumer loan and REO portfolios who is marketing these TransLand loans. The $14.5 million provision was part of a $39.9 million provision for loan losses recorded during the three months ended March 31, 2008.

As a result of these charges, the Company recorded a net loss of $60.9 million, or $3.60 per diluted share, for the three months ended March 31, 2008. This compares to net income of $9.4 million, or $0.55 per diluted share, for the same period one year ago.

"Today's financial and credit environment is one of the most challenging our country has experienced in decades," said Gilbert G. Lundstrom, chairman and chief executive officer. "We have taken a number of steps to address the challenging issues facing TierOne. We remain focused on our fundamental core operations, combined with our financially solid capital position, to lead us through this unprecedented period of market disruption."

29.   On May 12, 2008, the Company filed its Form 10-Q for the first quarter of 2008 with the SEC. The Form 10-Q was signed and certified by Defendant Lundstrom and primarily reiterated the information contained in TierOne's May 9, 2008 press release.

30.   On June 25, 2008, the Company issued a press release entitled, "TierOne Corporation Sells Florida Delinquent Loan Portfolio." The press release stated, in pertinent part:

TierOne Corporation (NASDAQ: TONE) ("Company"), the holding company for TierOne Bank ("Bank"), announced today the Bank has closed on the sale of a $63.8 million Florida loan portfolio.

The sale primarily consisted of over 300 delinquent residential construction loans previously originated by TransLand Financial Services ("TransLand"), a Florida-based mortgage brokerage firm. The construction loans that were sold related to single-family properties located primarily in the Cape Coral area of southwest Florida.

"We are pleased to have completed this sale and to put much of our TransLand delinquent Florida loan issues behind us," said Gilbert G. Lundstrom, chairman and chief executive officer.

Based upon the present carrying value of the TransLand portfolio, the Company will not experience any material additional charge as a result of this sale. The sold TransLand loans represent approximately $12.7 million of the Company's total nonperforming loans.

31.   On June 30, 2008, the Company issued a press release entitled, "TierOne Corporation to Close Loan Production Offices." The press release stated, in pertinent part:

TierOne Corporation (NASDAQ: TONE) ("Company"), the holding company for TierOne Bank ("Bank"), announced today that the Bank will close all of its nine loan production offices across the country in an effort to direct its lending activity to its primary market area of Nebraska, Iowa and Kansas.

The lending offices being closed are located in Phoenix, Arizona; Colorado Springs, Denver and Fort Collins, Colorado; Orlando, Florida; Minneapolis, Minnesota; Las Vegas, Nevada and Charlotte and Raleigh, North Carolina.

"Due to the continued housing and economic challenges in many areas of the country, TierOne is refocusing our lending efforts in our existing bank market area," said Gilbert G. Lundstrom, chairman and chief executive officer.

Loans with existing customers will continue to be serviced by TierOne. The three Colorado offices are scheduled to close by July 30. The Las Vegas, Phoenix and Raleigh offices will close by late summer. Loan servicing functions for existing customers will be retained in Charlotte, Minneapolis and Orlando at this time. Customers associated with each loan production office will be notified directly of the pending change.

Twenty employees currently work in the Bank's loan production offices. Five are expected to be retained to assist with loan servicing and customer communication. The remaining staff will be offered severance packages. The office closings are not expected to impact employment at the Company's headquarters in Lincoln, Nebraska.

Lundstrom said the Bank intends to leverage its extensive retail franchise throughout Nebraska, Iowa and Kansas, its name recognition and community involvement and its knowledge of the local market place to strengthen its lending operation.

"These efforts combined with the greater stability of the Midwest lending environment are expected to contribute to our growth and improve asset quality," Lundstrom said.

To expand its ability to originate residential construction and commercial real estate loans, the Bank opened its first loan production offices in Colorado and Minnesota in late 2002 and 2003. The Arizona, Florida and North Carolina offices were purchased by the Bank from First Indiana Bank in late 2004. The Las Vegas office was opened in 2005.

32.    On August 1, 2008, the Company issued a press release announcing its financial results for the second quarter of 2008. The press release provided, in pertinent part:

11

TierOne Corporation (NASDAQ: TONE) ("Company"), the holding company for TierOne Bank ("Bank"), reported a net loss of $12.7 million, or $(0.75) per diluted share, for the three months ended June 30, 2008 which includes a $27.7 million provision for loan losses recorded during the second quarter. This compares to net income of $2.5 million, or $0.14 per diluted share, earned during the three months ended June 30, 2007 after the Company reported a $10.2 million provision for loan losses during that respective period.

For the first six months of 2008, the Company recorded a net loss of $73.6 million, or $(4.36) per diluted share, compared to net income of $11.8 million, or $0.69 per diluted share, for the first half of 2007. To address the current housing and economic conditions, the Company recorded $67.6 million of loan loss provisions during the first six months of 2008 compared to $11.7 million in the same period of 2007. Additionally, the Company incurred a $42.1 million non-cash goodwill impairment charge during the first half of 2008.

"The turbulence caused by today's housing recession has resulted in one of the most challenging periods for financial institutions in generations," said Gilbert G. Lundstrom, chairman and chief executive officer. "We continue to take a number of steps that, in combination with our fundamental core operations and well-capitalized position, are intended to minimize exposure and assist TierOne in navigating through this very difficult economic period."

Measures implemented during the second quarter 2008 to preserve capital and address asset quality included a reduction in the Company's quarterly cash dividend paid to shareholders, the sale of a delinquent Florida loan portfolio and the decision to close all nine of the Bank's loan production offices. These steps are in addition to several other on-going actions to realign credit administration functions, tighten credit policies and limit exposure in selected business lines and geographic markets.

The Bank's primary federal regulator, the Office of Thrift Supervision ("OTS"), recently completed its regular comprehensive safety, soundness and compliance examination. Upon completion of this review and the establishment of additional loan loss reserves, the Bank continues to maintain strong liquidity, remains in full capital compliance and exceeds all regulatory capital requirements necessary to earn a "well capitalized" rating, the highest capital rating recognized for federally-insured financial institutions. Additionally, the Company holds significant funds which also serve as a source of strength for the Bank.

33.    On August 8, 2008, the Company filed its Form 10-Q for the second quarter of 2008 with the SEC. The Form 10-Q was signed and certified by Defendant Lundstrom and largely reiterated the information contained in the Company's August 1, 2008 press release.

34.     On October 30, 2008, the Company issued a press release announcing its financial

results for the third quarter of 2008.  The press release provided, in pertinent part:

> TierOne Corporation (NASDAQ: TONE) ("Company"), the holding company for
> TierOne Bank ("Bank"), reported today that the Company recorded net income of
> $2.1 million, or $0.13 per diluted share, for the three months ended September 30,
> 2008 compared to a net loss of $5.9 million, or $(0.35) per diluted share, for the
> same period one year ago.
>
> For the nine months ended September 30, 2008, the Company recorded a net loss
> of $71.5 million, or $(4.24) per diluted share, compared to net income of $6.0
> million, or $0.35 per diluted share for the first nine months of 2007. Based on an
> analysis of its loan portfolio and current economic conditions, the Company
> recorded provisions for loan losses of $73.6 million for the nine months ended
> September 30, 2008 compared to $29.2 million for the comparable period in
> 2007. The Company also recorded a $42.1 million non-cash goodwill impairment
> charge during the first quarter of 2008.
>
> "The unprecedented turbulence in national and global financial credit markets
> compounded by continued erosion in several regional housing sectors throughout
> the country have created a level of turmoil in the banking industry unmatched in
> the last 75 years," said Gilbert G. Lundstrom, chairman and chief executive
> officer. "Subject to further erosion in the economy, we are beginning to realize
> the benefits of the aggressive steps we have taken in previous quarters to better
> position ourselves for the future. In looking ahead, our efforts will remain focused
> on our core fundamental operations and reinforcing our capital position."
>
> In managing through the current economic cycle, the Company has implemented
> several key initiatives designed to address asset quality, restore long-term
> profitability and increase capital. During the third quarter of 2008, the Bank
> closed all nine of its loan production offices throughout the country, further
> reduced nonresidential and nonconsumer-related loan balances by $96.0 million,
> or 4.3 percent, and continued to make progress in realigning its loan portfolio
> with lower risk-weighted assets. The Bank continues to monitor the portfolio and
> establishes reserves on impaired loans while also actively working directly with
> individual borrowers in addressing delinquency issues.
>
> On the capital front at September 30, 2008, the Bank continued to be categorized
> as a "well capitalized" financial institution; the highest rating recognized by the
> federal government. Subsequent to the end of the latest fiscal quarter, the
> Company also infused an additional $10.0 million capital contribution to the
> Bank. Consistent with regulatory limitations and as a means to further supplement
> its capital position during this period of current market volatility, the Company
> has suspended the payment of its quarterly cash dividend to shareholders.

Collectively, these steps will contribute to the Company's on-going efforts to preserve and strengthen capital.

35.    On November 10, 2008, the Company filed its Form 10-Q for the third quarter of 2008 with the SEC.  The Form 10-Q was signed and certified by Defendant Lundstrom and largely reiterated the information contained in the Company's October 20, 2008 press release.

**The Supervisory Agreement with the Office of Thrift Supervision**

36.    On January 15, 2009, the Company issued a press release entitled "TierOne Bank Enters Into Supervisory Agreement with Federal Regulators."  The press release provided, in pertinent part:

> TierOne Corporation (NASDAQ: TONE) ("Company"), the holding company for TierOne Bank ("Bank"), announced today the Bank has entered into a supervisory agreement with the Office of Thrift Supervision ("OTS"), the Bank's primary federal regulator, setting forth steps the Bank is taking in response to regulatory concerns with its previous operating results and to address the current economic environment facing the banking and financial industry.

> "This agreement is not expected to have any impact on the day-to-day operations of the Bank or our relationship with customers or our employees," said Gilbert G. Lundstrom, chairman and chief executive officer of the Bank. "Many of the steps contained in the agreement are consistent with the actions we have previously announced and completed, or are in the process of implementing, as
> TierOne navigates through this period of unprecedented economic disruption."

> The supervisory agreement requires, among other things, the review, and where appropriate, revisions to the Bank's business strategies impacting selected loan policies, procedures and reporting; enhancements to credit administration and underwriting, asset classification, allowance for loan and lease loss analysis, internal asset review and management oversight; restrictions on capital distributions; and strengthening the Bank's capital position, including elevated requirements that the Bank maintain a minimum core capital ratio of 8.5% (compared to 5.0%) and a minimum total risk-based capital ratio of 11.0% (compared to 10.0%). The supervisory agreement will remain in effect until modified, suspended or terminated by the OTS.

> At September 30, 2008, the Bank's core and total risk-based capital levels were 9.0% and 11.4%, respectively, both in excess of the elevated requirements even before taking into account a $10.0 million capital contribution which the Company made to the Bank in October 2008.

14

In addition, the Company agreed with OTS to maintain the elevated capital levels at the Bank. As reported in a recent filing with the Securities and Exchange Commission, the Company contributed $29.1 million to the Bank during the first ten months of 2008. The Company also agreed with the OTS to not pay any dividends on its common stock, make payments on its trust preferred securities or repurchase any shares of its common stock until OTS issues a written notice of non-objection.

37.    The above information caused the Company's stock to fall on January 16, 2009 from a prior closing price $3.38 per share to $2.10 share.

38.    The Supervisory Agreement between TierOne and the OTS provided that "based on the findings set out in the Report of Examination pertaining to the OTS's examination of the Bank commenced on June 2, 2008 (ROE), ***OTS is of the opinion that the Bank violated regulations and engaged in acts and practices that are considered to be unsafe and unsound***." (emphasis added).   Though the Supervisory Agreement did not specifically identify which practices of the Company constituted violations of regulations, the actions taken in the Agreement provide some insight into TierOne's deficiencies.

39.    The Agreement required TierOne's management to review each loan exceeding $1,000,000.  The Agreement described the role of the review, in pertinent part, as follows:

This evaluation, at a minimum shall: (i) identify significant loan underwriting, documentation, or administration deficiencies, if any; (ii) set forth the most recent collateral or appraisal valuations; (iii) determine the appropriate asset classification category; (iv) effectively identify the risks with respect to the asset; (v) identify whether the loan is impaired and, if impaired, provide an estimate of the loan impairment; (vi) recommend any required SVAs, charge-offs, or ALLL allocation; and (viii) provide a resolution plan, if appropriate.

40.    With regard to high loan-to-value loans, the Agreement established the following requirements:

A. By December 31, 2008, the Board shall adopt and submit to OTS a certified resolution stating that: (i) management reviewed the loan portfolio and identified all high loan-to-value loans, as defined in Appendix to 12 CFR § 560.101, and presented the list of such loans to the Board for its review, and

15

(ii) the Board will require management to submit an accurate list of high loan-to-value loans to the Board for review each quarter.

B. By December 31, 2008, the Board shall adopt and submit to OTS a written plan for the establishment of a system of internal controls, including the designation of responsible personnel and the provision of quarterly reports to the Board, to ensure that the Bank complies with the Appendix to 12 CFR § 560.101.

41. With regard to the Company internal asset review, the Agreement provided the following:

A. By December 31, 2008, the Board shall adopt and submit to OTS for written notice of non-objection a revised written Internal Asset Review (IAR) Program that is consistent with: (i) CEO Letters No. 140, dated May 31, 2001 and entitled "Effective Internal Asset Review Systems"; (ii) CEO Letter No. 250; and (iii) CEO Letter No. 280, dated September 17, 2008, and entitled "Documentation and Underwriting Standards". The IAR Program shall: (i) assess the overall asset quality; (ii) determine problem assets; (iii) identify weaknesses in the Bank's loan underwriting, documentation, and administration policies and procedures; (iv) violations of applicable regulations or the Bank's policies; (v) assess the adherence to internal loan policies; (vi) provide information in determining the adequacy of the ALLL; (vii) identify relevant trends that affect the collectability of the portfolio; and (viii) review the lending personnel's activities.

B. The IAR Program shall be conducted by either a qualified independent third party consultant and/or an adequately staffed department of qualified and independent personnel.

C. The IAR Program shall: (i) set forth the frequency, scope, and depth of the reviews; (ii) require a review by senior executive management and the Board of the IAR findings; and (iii) require the oversight of follow-up corrective actions by a committee composed of Outside Directors (as defined in Paragraph 19C hereof) or the Audit Committee. Management shall not change or alter the findings of an IAR report.

42. The Agreement further specifically addressed the Board's oversight of management by requiring that the Company evaluate the following:

- The performance of the Bank's senior executive officers that includes an assessment of the responsibility and involvement of each senior executive officer for, in the opinion of OTS, the violations and unsafe and unsound

16

practices set forth in the ROE;

- The ability of the management team to effectively address the concerns disclosed in the ROE and to operate the Bank in a safe and sound manner in compliance with all applicable laws and regulations; and

- The performance of the Board in overseeing the activities of senior executive officers and the Bank's compliance with applicable laws and regulations and engagement in practices about which regulatory concerns were set forth in the ROE.

43.    Upon evaluation of the preceding assessments, the Company was to "set forth recommendations, if any, for improving the Board's oversight and the Bank's compliance with applicable laws and regulations, safe and sound practices, and its policies."

**The Company's Continued Unsound Lending Practices and Regulatory Violations**

44.    On February 23, 2009, the Company issued a press release announcing its financial results for the fourth quarter of 2008.    The information in this press release was false and misleading because the Company failed to properly account for its loan loss provision and reserves.  The press release stated, in pertinent part:

> TierOne Corporation (NASDAQ: TONE) ("Company"), the holding company for TierOne Bank ("Bank"), reported today that *the Company recorded a net loss of $3.8 million, or ($0.22) per diluted share, for the three months ended December 31, 2008 as it continued efforts to build reserves. The fourth quarter 2008 loss compares to a net loss of $18.4 million, or ($1.09) per diluted share, for the same period in 2007. The results for the three months ended December 31, 2008 include the impact of a $1.8 million non-cash charge to establish a valuation reserve against the Company's net deferred tax assets.*
>
> *For the fiscal year ended December 31, 2008, the Company recorded a net loss of $75.2 million, or ($4.46) per diluted share, compared to a net loss of $12.4 million, or ($0.74) per diluted share, in 2007.* In response to the nation's challenging economic environment and the continued stress on real estate values, the Company recorded provisions for loan losses of $84.5 million for the year ended December 31, 2008 compared to $68.1 million in 2007. The Company also recorded a $42.1 million non-cash goodwill impairment charge in early 2008.
>
> "The widespread scope of our nation's weakening economy has had an unprecedented impact on nearly all aspects of the banking, financial, housing and

consumer markets," said Gilbert G. Lundstrom, chairman and chief executive officer. "Despite these many formidable challenges, the Bank's capital position remains strong. We remain very focused on building upon our core operations, achieving results from the many initiatives we have implemented and further reinforcing our capital position as we manage our way through this period of severe economic disruption."

At December 31, 2008, the Bank's core and total risk-based capital ratios were 8.9 percent and 11.6 percent, respectively. An institution is considered "well capitalized" by the Office of Thrift Supervision ("OTS") if its core and total risk-based capital ratios exceed 5.0 percent and 10.0 percent, respectively. The OTS is the Bank's primary federal regulator. As later discussed, the Bank's year-end 2008 core and total risk-based capital levels also exceed elevated OTS requirements of 8.5 percent and 11.0 percent, respectively. The Bank's capital position was further strengthened following a $10.0 million capital contribution from the Company to the Bank in the fourth quarter and the continued realignment of the Bank's loan portfolio to lower risk-weighted assets. According to September 30, 2008 data furnished by the FDIC, the latest information available, the Bank's total risk-based and core capital levels ranked the Bank as the second and fourth highest, respectively, among the ten largest banks operating in Nebraska even prior to the additional $10.0 million capital contribution the Bank received from the Company in the fourth quarter.

45.    On March 13, 2009, the Company filed a Form 10-K with the SEC, which primarily reiterated the information announced in the February 23, 2009 press release. The Form 10-K was signed by Defendants Lundstrom and Hoskins and certified by Defendant Lundstrom. This Form 10-K falsely states that the Company's internal controls were effective.

46.    On May 5, 2009, the Company issued a press release announcing its financial results for the first quarter of 2009. This press release and the financial information contained therein was materially false and misleading because the Company failed to account for its loan loss reserves and provisions. The press release stated, in pertinent part:

TierOne Corporation (NASDAQ: TONE) ("Company"), the holding company for TierOne Bank ("Bank"), reported today that the Company recorded a net loss of $9.8 million, or ($0.58) per diluted share, for the three months ended March 31, 2009 compared to a net loss of $60.9 million, or ($3.60) per diluted share, for the same period one year ago.

*The results for the three months ended March 31, 2009 included a provision for loan losses of $12.2 million compared to $39.9 million for the first quarter of 2008. Quarterly results for the three-month period ended March 31, 2008 were also impacted by the Company's recording of a $42.1 million non-cash goodwill impairment charge.*

"TierOne, like many financial institutions throughout the country, continues to manage through numerous credit, earnings and industry challenges," said Gilbert G. Lundstrom, chairman and chief executive officer. "*These challenges have certainly been formidable. However, the resiliency of our local economy combined with our core banking operations are expected to contribute to our efforts to mitigate risk and position TierOne for the future.*"

The Bank's core and total risk-based capital levels at March 31, 2009 were 8.6 percent and 11.4 percent, respectively. Under regulatory guidelines required by the Office of Thrift Supervision ("OTS"), the Bank's primary federal regulator, a typical thrift is considered "well capitalized" if its core and total risk-based capital ratios exceed 5.0 percent and 10.0 percent, respectively. The Bank's March 31, 2009 core and total risk-based capital ratios also exceed elevated OTS requirements of 8.5 percent and 11.0 percent, respectively, that are mandated by the Bank's supervisory agreement with the OTS. Among the ten largest financial institutions operating in Nebraska, the Bank has the second and third highest total risk-based and core capital ratios based on the latest available December 31, 2008 data furnished by the Federal Deposit Insurance Corporation ("FDIC"). (Emphasis added)

47.     On May 8, 2009, TierOne filed with the SEC its Q1 2009 Form 10-Q, which was signed and certified by Defendant Lundstrom. The Form 10-Q largely reiterated the information announced in the May 5, 2009 press release. The Form 10-Q also falsely stated that the Company's internal controls were effective.

48.     On August 7, 2009, the Company issued a materially false press release announcing its results for the second quarter ended June 30, 2009. The press release was false because the Company failed to properly account for loan loss reserves in the financial information contained therein.

49.     On August 7, 2009, the Company issued a press release announcing its financial results for the second quarter of 2009. The press release stated, in pertinent part:

19

TierOne Corporation (NASDAQ: TONE) ("Company"), the holding company for TierOne Bank ("Bank"), reported today that the Company recorded a net loss of $16.1 million, or ($0.95) per diluted share, for the three months ended June 30, 2009. Second quarter 2009 earnings reflect a $21.7 million provision for loan losses and increased Federal Deposit Insurance Corporation ("FDIC") insurance premiums, including the Bank's $1.5 million share of an industry-wide special FDIC assessment.

These results compare to a net loss of $12.7 million, or ($0.75) per diluted share, for the three months ended June 30, 2008. Included in the second quarter 2008 results was a $27.7 million provision for loan losses offset by $7.2 million of tax benefits.

For the first half of 2009, the Company reported a net loss of $25.9 million, or ($1.53) per diluted share, compared to a net loss of $73.6 million, or ($4.36) per diluted share, for the first six months of 2008. The 2009 year-to-date results include $33.8 million of loan loss provisions and $5.6 million of FDIC insurance premiums. For the comparable period in 2008, the $73.6 million net loss included a $67.6 million loan loss provision, a $42.1 million non-cash goodwill impairment charge and $802,000 of FDIC insurance premiums partially offset by a $19.5 million tax benefit.

"Continued strength in our core operations combined with our liquidity and a strong retail franchise are expected to contribute to our efforts in managing through this challenging period as TierOne Bank positions itself for the post-recession economy," said Gilbert G. Lundstrom, chairman and chief executive officer.

At June 30, 2009, the Bank's core and total risk-based capital ratios were 8.5 percent and 11.3 percent, respectively. Under guidelines required by the Office of Thrift Supervision ("OTS"), the Bank's federal regulator, a typical thrift is considered "well capitalized" if its core and total risk-based capital ratios exceed 5.0 percent and 10.0 percent, respectively. Under its supervisory agreement with the OTS, the Bank is subject to elevated core and total risk-based capital requirements of 8.5 percent and 11.0 percent, respectively. The Bank was in compliance with these elevated requirements at June 30, 2009.

50.    On August 10, 2009 the Company filed its Form 10-Q for the second quarter of 2009. The Form 10-Q was signed and certified by Defendant Lundstrom and primarily reiterated the information announced in the press release issued the same day.

51.     On September 4, 2009, the Company issued a press release in which TierOne

announced plans to sell certain loans and assets to Great Western Bank.   The press release

provided, in pertinent part:

> TierOne Corporation (NASDAQ:  TONE) ("Company"), the holding company for
> TierOne Bank ("Bank"), announced today the Company and the Bank have
> entered into a definitive agreement ("Agreement") to sell deposits, selected loans
> and other assets associated with 32 of the Bank's branch offices to Great Western
> Bank, a South Dakota-based subsidiary of National Australia Bank. The
> transaction, which is subject to regulatory approval and other customary closing
> conditions, is expected to be completed as soon as late 2009.
>
> Under the terms of the Agreement, Great Western Bank will assume
> approximately $1.1 billion in deposits. The Bank will transfer or sell to Great
> Western Bank approximately $800.0 million in loans, $20.0 million in real estate
> and other assets and the balance in cash or securities less a $55.0 million deposit
> premium paid.
>
> The branch offices involved in the transaction are located in Broken Bow,
> Burwell, Callaway, Columbus (2), Gothenburg, Grand Island (2), Holdrege (2),
> Lexington (3), McCook, North Platte (2), O'Neill, Omaha (9), Ord, Papillion and
> St. Paul, Nebraska and three offices located in Council Bluffs, Iowa.  Many of the
> branch offices being sold were acquired by the Company in its 2004 acquisition
> of United Nebraska Bank.  The remaining branches consist of other facilities the
> Bank has built or acquired.
>
> "After the branch office sale, TierOne Bank will return to its historic community
> bank footprint and will enhance its capital position," said Gilbert G. Lundstrom,
> chairman and chief executive officer.  "Completion of the transaction will fortify
> the Bank's capital levels. This additional capital will strengthen our ability to
> continue to address selected asset quality issues and improve our capacity to
> manage through this challenging economic period. As we have in the past, we
> will continue to evaluate our loan portfolio and take necessary action to manage
> our balance sheet."
> Upon completion of the transaction, TierOne Bank will have 37 banking offices
> located in Nebraska, Iowa and Kansas and approximately $2.0 billion in assets, or
> about the same asset size the Bank was prior to its United Nebraska Bank
> acquisition.
>
> "TierOne Bank's solid presence in its robust headquarters city of Lincoln,
> combined with its highly respected position in many of our market area's leading
> communities, will continue to serve as a strong foundation for our future success,"
> Lundstrom added.  "Looking forward, with one of the larger retail franchises in
> our region and enhanced capital levels, we plan to strengthen our legacy as a

responsive community bank and build upon the trust and loyalty TierOne Bank has earned from our employees, customers and communities over our 102-year history."

52.    The above announcement caused the Company's stock to rise on September 4, 2009 from a previous closing price $2.16 per share to $3.13 – a 45% increase.

53.    On October 14, 2009, the Company filed a Form 8-K with the SEC. The Form 8-K, described certain material impairments, including TierOne's anticipated restatement of previously disseminated financial statements. The Form 8-K further explained that as a result of the Company's continually poor financial performance, its core capital ratio was no longer capable of being deemed "well capitalized," pursuant to the Supervisory Agreement or pursuant to other OTS standards.   The Form 8-K provided, in pertinent part:

> TierOne Corporation ("Company") is the holding company for TierOne Bank ("Bank"). In connection with an examination of the Bank which commenced after the Company filed its second quarter 2009 Form 10-Q, the Office of Thrift Supervision ("OTS"), the Bank's primary regulator, directed the Bank to establish additional loan loss provisions for the quarter ended June 30, 2009 because of differences of opinion and the timeliness of credit information used in estimating the fair value assessment of collateral on five individual credits. As a result of the OTS examination, the Bank also was directed to effect, retroactive to June 30, 2009, certain loan grading changes. In particular, the OTS directed the Bank to reclassify $82.3 million in loans previously designated as "special mention" into adverse classifications.
>
> *In light of the foregoing, on October 13, 2009, the Company's Audit Committee, in consultation with the Company's management and independent registered public accountants, determined that the Company will record an additional loan loss provision of approximately $13.9 million (which includes a total charge-off of approximately $10.6 million) for the three months ended June 30, 2009 to reflect, as directed by the OTS, an adjustment to its allowance for loan losses as of June 30, 2009.* As noted in Item 4.02 below, the Company intends to file an amended Form 10-Q for the quarter ended June 30, 2009 (including restated financial statements) as soon as practicable to reflect the effects of the above-referenced charge-offs, loan grading changes and increase in the allowance for loan losses.
>
> The Bank is currently subject to a supervisory agreement that it entered into with the OTS on January 15, 2009. *Among other things, the supervisory agreement requires the Bank to maintain enhanced minimum capital requirements in*

22

*excess of those required of an institution deemed to be "well capitalized" by the OTS. As a result of the above-referenced restatement, the Company expects that the Bank's minimum core capital ratio, as of June 30, 2009, will be adjusted to approximately 8.11%, which is below the elevated ratio of 8.50% required by the supervisory agreement (the regulatory core capital ratio normally required to be deemed "well capitalized" is 5.00%). The Bank's total risk-based capital ratio, as of June 30, 2009, is expected to be adjusted to approximately 10.85%, which is below the 11.00% required by the supervisory agreement (the regulatory total risk-based capital ratio normally required to be deemed "well capitalized" is 10.00%).* The Bank's failure to comply with the supervisory agreement could result in, among other actions, the initiation of additional enforcement actions by the OTS.

As part of the Bank's efforts to maintain enhanced minimum capital requirements pursuant to its supervisory agreement with the OTS, on September 4, 2009, the Company announced that the Company and the Bank had entered into a definitive agreement ("Agreement") to transfer deposits and sell selected loans and other assets associated with 32 of the Bank's branch offices to Great Western Bank, a South Dakota-based subsidiary of National Australia Bank. The Bank believes the consummation of the transactions contemplated by the Agreement, which are subject to, among other conditions, the receipt of regulatory approval, will result in the Bank's capital position exceeding the enhanced OTS minimum capital requirements imposed by the supervisory agreement. There can be no assurances, however, that the Bank will be in compliance with these enhanced minimum capital requirements upon consummation of the transactions contemplated by the Agreement due to unforeseen or intervening events nor can there be any assurance that the Agreement will receive all regulatory and other approvals and the transactions thereunder consummated. The parties to the Agreement are seeking to consummate the transactions contemplated by the Agreement as early as late 2009 but there are no assurances that such schedule will be achieved.

The Bank continues to evaluate its loan portfolio as well as its loan loss reserves. Depending on future circumstances and events, additional loan loss provisions may be required for periods subsequent to June 30, 2009.

Item 4.02(a).  Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review

*On October 13, 2009, as a result of the matters described in Item 2.06 hereof (which disclosure is incorporated herein by reference), the Audit Committee of the Company determined that the financial statements as of and for the three-month and six-month periods ended June 30, 2009 contained in the Quarterly Report on Form 10-Q filed by the Company on August 10, 2009 should not be relied upon. The Company plans to restate its financial statements for such periods and will present the restated financial statements in an amendment to its Quarterly Report on Form 10-Q for the quarter ended June 30, 2009 as soon*

*as practicable.* The Bank will likewise file an amended Thrift Financial Report for the period ended June 30, 2009.

The Audit Committee and the management of the Company and the Bank discussed the matters disclosed in this filing with the Company's independent registered public accountants. (Emphasis added)

54.    On November 10, 2009, the Company filed another Form 8-K relating to its

quarterly filing of its Thrift Financial Reports. The Form 8-K stated, in pertinent part:

TierOne Corporation (the "Company") is the holding company for TierOne Bank (the "Bank"). On a quarterly basis, the Bank is required to file Thrift Financial Reports ("TFRs") with the Office of Thrift Supervision (the "OTS"). The OTS is the Bank's primary regulator. The TFR requires the Bank to report various information, including financial statement and supplemental data regarding the Bank's performance and financial condition for and as of the quarter covered by the TFR.

On November 5, 2009, the Bank filed its TFR for the quarter ended September 30, 2009. *The TFR reflected a loan loss provision of approximately $120.2 million (which includes a total charge-off of $109.8 million) for the three months ended September 30, 2009.* The loan loss provision and the charge-offs for the third quarter reflect (i) the results of the ongoing OTS examination of the Bank; (ii) the receipt of recent, updated appraisals which show continued deterioration of property values in selected markets; (iii) aggressive steps undertaken by management to dispose of the Bank's problem assets; and (iv) management's subjective judgment as to continued deterioration in the Bank's loan portfolio resulting from ongoing economic challenges generally and, in particular, challenges in the real estate market.

In a Form 8-K filing dated October 13, 2009, the Company had previously disclosed that it would be restating its financial statements as of and for the three-month and six-month periods ended June 30, 2009. *In the Form 8-K filing, the Company reported that it expected an additional loan loss provision of $13.9 million (including a total charge-off of $10.6 million) for the three months ended June 30, 2009. On November 5, 2009, the Bank filed an amended TFR for the quarter ended June 30, 2009 and reported an increase to $17.4 million (including a total charge-off of $14.1 million) in the additional loan loss provision for such quarter. The $3.3 million increase in the additional loan loss provision resulted from the further review of the Bank's loan portfolio that is being undertaken as the Company continues to prepare its restated financial statements for inclusion in an amended Form 10-Q for the quarter ended June 30, 2009.*

The Bank is currently subject to a supervisory agreement that it entered into with the OTS on January 15, 2009. Among other things, the supervisory agreement requires the Bank to maintain enhanced minimum capital requirements in excess of those required of an institution deemed to be "well capitalized" by the OTS. As a result of the financial performance reported in the above-referenced TFRs, the Bank's minimum core capital ratio, as of June 30, 2009, was approximately 7.95%, which is below the elevated ratio of 8.50% required by the supervisory agreement (the regulatory core capital ratio normally required to be deemed "well capitalized" is 5.00%). The Bank's total risk-based capital ratio, as of June 30, 2009, was approximately 10.66%, which is below the 11.00% required by the supervisory agreement (the regulatory total risk-based capital ratio normally required to be deemed "well capitalized" is 10.00%). *With the additional loan loss provisions discussed above, as of September 30, 2009, the Bank's core capital and total risk-based capital ratios were approximately 4.00% and 6.09%, respectively.*

*The Bank, as of September 30, 2009, is below both the enhanced capital requirements set forth in the supervisory agreement as well as the ratios normally required to be deemed "well capitalized" by the OTS.* The Bank's total risk-based capital ratio of 6.09% as of September 30, 2009 results in the Bank being classified as "undercapitalized." As a result of being undercapitalized as of September 30, 2009, the Bank is required to submit a capital restoration plan and is subject to various additional restrictions provided by the terms of the Prompt Corrective Action regulations. It is possible that the OTS may take additional actions as a result of the Bank's capital status and the ongoing examination of the Bank by the OTS. The Company cannot currently predict what impact it may experience as a result of the actions that may be taken by the OTS.

As part of the Bank's efforts to increase its capital, as previously disclosed the Company and the Bank entered into a definitive agreement, dated September 3, 2009 (the "Agreement"), to transfer deposits and sell selected loans and other assets associated with 32 of the Bank's branch offices to Great Western Bank, a South Dakota-based subsidiary of National Australia Bank. The increased capital expected to result from the consummation of the transactions contemplated by the Agreement (which Agreement is subject to, among other conditions, the receipt of regulatory approval), combined with a reduction in risk-based assets due to the sale, is expected to result in the Bank being deemed "adequately capitalized," but below the levels required to be "well capitalized" or to be in compliance with the supervisory agreement. In addition, there can be no assurances that the Bank will be at least "adequately capitalized" upon consummation of the transactions contemplated by the Agreement due to unforeseen or intervening events, including possible further regulatory actions as a result of the OTS examination, nor can there be any assurance that the Agreement will receive all necessary regulatory and other approvals in order to be able to consummate the transaction. The Bank is currently seeking to consummate the transactions contemplated by the Agreement in the first quarter of 2010 but there are no

assurances that such schedule will be achieved. The closing of the transaction is subject to customary conditions precedent, including regulatory approval, several of which are beyond the Company's ability to control.

In addition, The Worker, Homeownership and Business Assistance Act of 2009, passed into law last week, contains a provision permitting companies to carryback 2008 or 2009 losses for five years and to obtain a refund of taxes previously paid. The Bank intends to carryback losses that are expected to result in a fourth quarter 2009 tax benefit to the Bank of approximately $26.5 million. However, the exact amount of the benefit is subject to adjustment and may be significantly less than this amount.

Item 8.01.     Other Events.

As previously reported, the Company is in the process of preparing an amended Form 10-Q for the quarter ended June 30, 2009. The amended Form 10-Q will include restated financial statement as of and for the three-month and six-month periods ended June 30, 2009. The restated financial statements are required because the OTS directed the Bank to establish additional loan loss provisions for the 2009 second quarter. The Company intends to file the amended Form 10-Q as soon as practicable after management has completed its reassessment of the Bank's loan portfolio. The delay in the preparation of the amended second quarter Form 10-Q has also resulted in a delay in filing of the Company's Form 10-Q for the quarter ended September 30, 2009, which filing was due on November 9, 2009. The Company is working diligently to file both the amended second quarter Form 10-Q and the third quarter Form 10-Q as promptly as possible. The Company will not, however, be able to make such filings within the five calendar day grace period potentially available pursuant to Rule 12b-25 under the Securities Exchange Act of 1934, as amended. (Emphasis added)

55.     On November 13, 2009, the Company issued a press release explaining that TierOne is not in compliance with NASDAQ's filing requirements. The press release provided, in pertinent part:

TierOne Corporation (NASDAQ: TONE) ("Company"), the holding company for TierOne Bank ("Bank"), today reported that the Company received an expected letter from The NASDAQ Stock Market ("NASDAQ") advising that, because the Company did not file its Form 10-Q for the fiscal quarter ended September 30, 2009 by the due date, it is not in compliance with the filing requirement under NASDAQ Marketplace Rule 5250(c)(1).

The Company currently anticipates making all necessary filings to become current in its reporting obligations as soon as practicable. Pursuant to NASDAQ rules, the Company has until January 11, 2010 to submit a plan to the NASDAQ staff to regain compliance with NASDAQ's filing requirement. The Company will

26

endeavor to become current in its reporting obligations prior to such date, and intends to submit a compliance plan to NASDAQ if it is unable to do so. Following any such submission, NASDAQ may provide the Company with up to 180 days from that initial delinquent filing, or until May 10, 2010, to regain compliance.

56.   On December 29, 2009, the Company issued a press release explaining that

TierOne was not in compliance with the listing requirements under NASDAQ Marketplace rules

because the Company has not maintained a minimum bid price of $1.00 per share for the

previous 30 consecutive business days.  The press release stated, in pertinent part:

> December 29, 2009 - TierOne Corporation (NASDAQ: TONE) ("Company"), the holding company for TierOne Bank ("Bank"), today reported that the Company, as expected, received a letter on December 28, 2009 from The NASDAQ Stock Market ("NASDAQ") advising that, *because the Company has not maintained a minimum bid price of $1.00 per share for the previous 30 consecutive business days, it is not in compliance with the listing requirement under NASDAQ Marketplace rules.*
>
> In accordance with NASDAQ Marketplace rules, the Company has 180 calendar days, or until June 28, 2010, to regain compliance with the minimum bid rule. If prior to June 28, 2010 the bid price of the Company's common stock closes at or above $1.00 per share for a minimum of ten consecutive business days, NASDAQ will notify the Company of its return to compliance. In the event the Company's common stock does not regain compliance within the 180-day period, NASDAQ will issue the Company a delisting letter, which the Company may appeal. The Company is currently evaluating its options and intends to take the appropriate steps to retain NASDAQ listing compliance.

57.   On February 5, 2010, the Company issued a Form 8-K related to the quarterly

filings of its Thrift Financial Report.  The Form 8-K stated, in pertinent part:

> TierOne Corporation ("Company") is the holding company for TierOne Bank ("Bank"). On a quarterly basis, the Bank is required to file a Thrift Financial Report ("TFR") with the Office of Thrift Supervision ("OTS"). The OTS is the Bank's primary federal banking regulator. The TFR requires the Bank to report various information, including financial statement and supplemental data, regarding the Bank's performance and financial condition for and as of the quarter covered by the TFR.
>
> On February 1, 2010, the Bank filed its TFR for the quarter ended December 31, 2009. The TFR reflected a loan loss provision and a loss provision for other real

estate owned of approximately $39.9 million and $10.4 million, respectively, for the three months ended December 31, 2009. The loss provisions for the fourth quarter reflect (i) the receipt of recent, updated appraisals which show continued deterioration of property values in selected markets; (ii) steps undertaken by management to dispose of the Bank's problem assets; and (iii) management's response to continued deterioration in the Bank's loan portfolio resulting from ongoing economic challenges generally and, in particular, challenges in the real estate market.

Also reflected in the TFR was a $26.9 million anual tax benefit recorded during the three months ended December 31, 2009. This tax benefit was primarily the result of passage of The Worker, Homeownership and Business Assistance Act of 2009, which was passed into law in the fall of 2009, which contains a provision permitting companies to carryback 2008 or 2009 losses for five years and to obtain a refund of taxes previously paid.

The Bank is subject to a supervisory agreement that it entered into with the OTS on January 15, 2009.  Among other things, the supervisory agreement requires the Bank to maintain enhanced minimum capital requirements in excess of those required of an institution deemed to be "well capitalized" by the OTS.  As a result of the net loss reported in the above-referenced TFR, the Bank's minimum core capital ratio, as of December 31, 2009, was approximately 3.28%, which is below the elevated ratio of 8.50% required by the supervisory agreement (the regulatory core capital ratio normally required to be deemed "well capitalized" is 5.00%).  The Bank's total risk-based capital ratio, as of December 31, 2009, was approximately 5.41%, which is below the 11.00% required by the supervisory agreement (the regulatory total risk-based capital ratio normally required to be deemed "well capitalized" is 10.00%).

***Since September 30, 2009, the Bank has been below both the enhanced capital requirements set forth in the supervisory agreement as well as the ratios normally required to be deemed "adequately capitalized" by the OTS.*** As a result of being undercapitalized at September 30, 2009, the Bank was required to submit a capital restoration plan and is subject to various additional restrictions imposed under the terms of the Prompt Corrective Action regulations. Pursuant to these regulations, the Bank submitted its capital restoration plan to the OTS within the required timeframe. No assurance can be given that the OTS will approve the capital restoration plan, or, if approved, that the Bank can achieve the plan to its fullest implementation. It is possible that the OTS may take additional actions as a result of the Bank's capital status and the Company cannot currently predict what impact it may experience as a result of the actions that may be taken by the OTS

As part of the Bank's efforts to increase its regulatory capital, as previously disclosed the Company and the Bank entered into a definitive agreement, dated September 3, 2009 ("Agreement"), to transfer deposits and sell selected loans and

other assets associated with 32 of the Bank's branch offices to Great Western Bank, a South Dakota-based subsidiary of National Australia Bank. The increased capital expected to result from the consummation of the transactions contemplated by the Agreement (which Agreement is subject to, among other conditions, the receipt of regulatory approval), combined with a reduction in risk-based assets due to the sale, is not expected to result in the Bank increasing capital levels above those required to be in compliance with the supervisory agreement. The Bank continues to explore other capital options to restore compliance with the supervisory agreement. The closing of the transactions contemplated by the Agreement are subject to customary conditions precedent, including receipt of all required regulatory approvals, several of which conditions are beyond the Company's ability to control. The Company and the Bank have applied for the requisite regulatory approvals, but such approvals have not yet been obtained. The Bank is currently seeking to consummate the transactions contemplated by the Agreement in the first quarter of 2010 but there are no assurances that such schedule will be achieved. The Agreement contains a termination date of March 3, 2010, which date generally is subject to an automatic 60-day extension if the only remaining condition precedent to consummation is receipt of all the necessary regulatory approvals.

***As previously reported, the Company is in the process of preparing an amended Form 10-Q for the quarter ended June 30, 2009. The amended Form 10-Q will include restated financial statements as of and for the three-month and six-month periods ended June 30, 2009. The restated financial statements are required because the OTS directed the Bank to establish additional loan loss provisions for the 2009 second quarter subsequent to the filing of the Form 10-Q for such period.*** The Company intends to file the amended Form 10-Q as soon as practicable after management has completed its reassessment of the Bank's loan portfolio. The Company is also assessing the effect of the restatement on its internal control over financial reporting and its disclosure controls and procedures, and is evaluating whether financial statements for other reporting periods require restatement.

The delay in the preparation of the amended second quarter Form 10-Q resulted in the delay in filing of the Company's Form 10-Q for the quarter ended September 30, 2009, which filing was due on November 9, 2009 and has not yet been filed. The Company is working diligently to file both the amended second quarter Form 10-Q and the third quarter Form 10-Q as promptly as possible.

58.    On March 30, 2010, the Company issued a press release entitled, "TierOne Bank Executes Consent to Issuance of Prompt Corrective Action Directive with Federal Regulator; Announces Board and Management Changes." The press release provided, in pertinent part:

TierOne Corporation (NASDAQ: TONE) ("Company"), the holding company for TierOne Bank ("Bank"), announced today that the Bank has executed a Stipulation and Consent to a Prompt Corrective Action Directive ("PCA Directive") with the Office of Thrift Supervision ("OTS"), the Bank's primary federal regulator, setting forth certain required recapitalization mandates and additional business and operational restrictions. The PCA Directive will become effective upon the acceptance of the Consent by the OTS and the issuance of the PCA Directive.

***Under the PCA Directive, among other things, the Bank will be required to be recapitalized prior to May 31, 2010, by either merging with or being acquired by another financial institution or by the sale of all or substantially all of the Bank's assets and liabilities to another financial institution. The PCA Directive further requires the Bank to submit a binding merger or acquisition agreement to the OTS by April 30, 2010, unless extended in writing by the OTS.*** The Company and the Bank cannot provide assurance that the deadlines and other terms of the PCA Directive can be satisfied. The Bank's consent to the PCA Directive follows the OTS' denial of the Bank's capital restoration plan.

59.     The press release further announced the resignation of several TierOne directors,

by stating:

The Company and the Bank also announced today that Charles W. Hoskins has been named acting Chairman of the Board and James A. Laphen has been named President and acting Chief Executive Officer of the Company and the Bank effective immediately. Hoskins, 73, has been serving as the Company's lead director. Laphen, 61, had previously been President and Chief Operating Officer of the Company and the Bank.

***The appointments of Hoskins and Laphen follow the resignation of Michael J. Falbo as Chairman and Chief Executive Officer and as a director of the Company and the Bank. Samuel P. Baird, Gilbert G. Lundstrom, James E. McClurg and James W. Strand also resigned from the Board of Directors of the Company and the Bank.*** These resignations follow ongoing discussions with the OTS regarding the terms of the PCA Directive, particularly with respect to the deadlines for compliance set forth in the PCA Directive. The directors who resigned did not indicate any disagreement with the Company or the Bank's operations, policies or practices.

Falbo was named Chairman and Chief Executive Officer on January 28, 2010. Lundstrom, who was named Vice Chairman following his retirement as Chairman and Chief Executive Officer in January, has been with TierOne Bank since 1994. Baird joined the Company's and the Bank's Boards in 2008 and both McClurg and Strand joined the Boards in July 2009.

60. The Prompt Corrective Action Directive came in response to the OTS's rejection of TierOne's proposed sale to Great Western Bank. An April 30, 2010 article from Minnesota's Star Tribune explained the situation as follows:

> ***Federal regulators have blocked TierOne Bank's proposed sale of 32 branches to Great Western Bank, leaving the future of the Lincoln-based financial institution uncertain.***

> ***The federal Office of Thrift Supervision denied the proposal for the bank to sell nearly half its full-service branches in a filing late Friday, saying the sale would leave TierOne in worse financial straits.***

> Friday was the deadline for TierOne to find an investor, buyer or merger partner. The bank, which holds about $2.9 billion in assets, has been struggling under the weight of bad loans in areas hit hard by the subprime crisis.

> Last month, federal regulators rejected TierOne's earlier plan to improve its balance sheet. They ordered the bank to have an agreement to improve its capital position by the end of April, and said the bank had to receive an infusion of funds by the end of May, unless regulators extended the deadlines.

> TierOne spokesman Ed Swotek said the bank was continuing to comply with previous directions from regulators and would move forward.

> The bank had agreed last fall to sell 32 of its full-service branches to Sioux Falls, S.D.-based Great Western to help raise capital. The banks had been awaiting regulatory approval of the sale. TierOne Corp., the parent company of the bank, said in a statement late Friday that since approval from the Office of Thrift Supervision was a condition of the deal, it cannot be completed.

> Officials at Great Western did not immediately respond to a message left late Friday.

> The proposed sale detailed in the denial would have included the transfer of $1 billion to $1.1 billion in deposit liabilities.

61. On April 9, 2010, the Company issued a press release entitled, "TierOne Corporation Receives Anticipated NASDAQ Delayed Filing Notice." The press release stated, in pertinent part:

> TierOne Corporation (NASDAQ: TONE) ("Company"), the holding company for TierOne Bank ("Bank"), today reported that the Company received an expected

31

letter from The NASDAQ Stock Market ("NASDAQ") advising that, because the Company did not file its Form 10-K for the fiscal year ended December 31, 2009 by the due date, the Company is not in compliance with the filing requirement under NASDAQ Marketplace Rule 5250(c)(1).

Pursuant to NASDAQ rules, the Company was required to submit a plan to the NASDAQ staff on how it planned to regain compliance with NASDAQ's filing requirement following the Company's delay in filing its Form 10-Q for the fiscal quarter ended September 30, 2009. The compliance plan submitted by the Company was subsequently accepted by NASDAQ. As stipulated in the compliance plan, the Company will endeavor to make all necessary filings, including the filing of the 2009 Form 10-K, to become current in its reporting obligations by April 30, 2010.

62.    On April 29, 2010, the Company issued a press release entitled, "TierOne Corporation Reports Resignation of KPMG LLP as Its Auditors." The press release stated, in pertinent part:

April 25, 2010 - TierOne Corporation (NASDAQ: TONE) ("Company"), the holding company for TierOne Bank, today reported that KPMG LLP has orally submitted its resignation effective April 23, 2010 as the Company's independent auditors. In addition, KPMG has orally informed the Company's Audit Committee that it has withdrawn its audit opinion and internal control assessment relating to the Company's financial statements at and for the year ended December 31, 2008 as well as its review of the Company's financial statements at and for the three months ended March 31, 2009. ***KPMG has orally indicated to the Company that those financial statements contain material misstatements and should not be relied upon by investors. The Company's Audit Committee is reviewing the statements made by KPMG and intends to commence a search for new independent auditors.***

The Company intends to file a current report on Form 8‑K with the United States Securities and Exchange Commission ("SEC") to report these events within the timeframe required by SEC regulations.

63.    In a Form 8-K filed with the SEC that same day, the Company further explained the reasons for the auditors' departure. The Form 8-K stated, in pertinent part:

It is the Company's understanding that KPMG has resigned as a culmination of factors related to an examination by the Office of Thrift Supervision (OTS), TierOne Bank's primary regulator, which required the Company to reevaluate its loan loss provisions for the quarter ended June 30, 2009. Specifically, on April

25, 2010, KPMG orally advised the Company (through the Company's Audit Committee) that KPMG requested on multiple occasions, and did not timely receive, a document estimating potential additional needs for specific reserves (the "document"), which was provided to the OTS and referenced in an OTS examination report, and that the Company allegedly asserted to the OTS, after the OTS had requested an additional copy of it, that the document had been destroyed. *KPMG further indicated that the document, and management's alleged actions related to it, lead KPMG to conclude that it is no longer able to rely on management's representations.*

Contrary to KPMG's position, the Company had previously provided the document to KPMG. Moreover, the document was provided electronically to the OTS and was not destroyed by the Company. *The Company also notes that at no point did KPMG inform the Company's Audit Committee of the failure to receive the document, and that as recently as April 19, 2010, KPMG had affirmed (without absolute assurance ) that it believed it could be in a position to issue its audit opinion in time for the Company to file its Annual Report on Form 10-K for the year ended December 31, 2009, amended Form 10-Q for the quarter ended June 30, 2009 and Form 10-Q for the quarter ended September 30, 2009 by April 30, 2010.*

*Reportable Events and Disagreements with the Independent Auditors*

The report of KPMG on the financial statements of the Company for the fiscal year ended December 31, 2008 contained no adverse opinions or disclaimer of opinion and was not qualified or modified as to uncertainty, audit scope or accounting principles (KPMG did not issue a report for the fiscal year ended December 31, 2009). For the fiscal years ended December 31, 2008 and December 31, 2009 and through the date of this report, there were no disagreements with KPMG on any matter of accounting principles or practices, financial statement disclosure or audit scope or procedure which, if not resolved to the satisfaction of KPMG, would have caused it to make reference to the subject matter of such disagreement in its reports on the financial statements for such fiscal years. Nor, except to the extent described below in this Form 8-K, were there any reportable events within the meaning of Item 304(a)(1)(v) of Regulation S-K for the fiscal years ended December 31, 2008 and December 31, 2009 and through the date of this report. In connection with KPMG's resignation, KPMG advised the Company orally that it had concluded that it is no longer able to rely on management's representations and that it was withdrawing its audit opinion relating to the Company's financial statements at and for the year ended December 31, 2008 contained in the Annual Report on Form 10-K filed by the Company on March 13, 2009 (the "2008 Form 10-K") because such financial statements contain material misstatements related to certain out of period adjustments for loan loss reserves; and that it was withdrawing its internal control assessment relating to the Company's financial statements at and for the year ended December 31, 2008 contained in the 2008 Form 10-K due to a material

weakness in internal control over financial reporting related to the material misstatements.

64.    On May 14, 2010, the Company filed a Form 8-K/A to include a letter that was

submitted by KPMG LLP to the SEC in response to TierOne's April 29, 2010 Form 8-K. The

letter stated, in pertinent part:

> Ladies and Gentlemen:
>
> We were previously engaged as principal accountants for TierOne Corporation (the Company). On April 23, 2010, we resigned. We have read the Company's statements included under Items 4.01 and 4.02 of its Form 8-K dated April 29, 2010, and we agree with such statements, except for the following under Item 4.01:
>
> I.    We are not in a position to agree or disagree with:
>
>> a.    the Company's statement in the second paragraph that it is in the process of commencing an immediate search for a new independent accountant; and
>>
>> b.    the Company's statement in the fourth paragraph that a document estimating potential additional needs for specific reserves was provided electronically to the Office of Thrift Supervision (OTS).
>
> II.    We do not agree with:
>
>> a.    The Company's statement in the third paragraph that KPMG resigned as a culmination of factors related to an examination by the OTS, which required the Company to reevaluate its loan loss provisions for the quarter ended June 30, 2009. While KPMG did describe a culmination of factors leading to its decision to resign, the factors were not limited to matters related to the OTS examination, and the Company's reference to a "document estimating potential additional needs for the specific reserves" is incomplete. KPMG told the Chair of the Company's Audit Committee that KPMG had learned of the existence of a document (the "document") showing an internal analysis of estimates of potential additional needs for specific reserves that appeared to have been created in the second quarter of 2009 and was told by a representative of the OTS that the document had been presented to the Company's Board of Directors during the second quarter of 2009. KPMG also

told the Chair of the Company's Audit Committee that the document had not been produced timely to KPMG, nor had it been included in the Board of Director materials provided to KPMG and that the Board of Director minutes did not include any reference of the presentation of the document or a discussion of it by the Board, and that management had represented to KPMG that all significant board and committee actions were included in the Board minutes provided to KPMG. ***KPMG told the Chair of the Company's Audit Committee that as a consequence KPMG believed it could not rely on prior representations by management, and was terminating its auditor relationship with the Company.***

b.    The Company's statement in the fourth paragraph that it had previously provided the document estimating potential additional needs for specific reserves to KPMG. KPMG was provided an electronic download of information from the Company's counsel on December 8, 2009, and has performed an electronic search of such electronically-provided information and has been unable to locate the aforementioned document that it obtained from the Company on April 20, 2010.

c.    The Company's statement in the fourth paragraph that as recently as April 19, 2010, KPMG had affirmed (without absolute assurance) that it believed it could be in a position to issue its audit opinion in time for the Company to file its Annual Report on Form 10-K for the year ended December 31, 2009, amended Form 10-Q for the quarter ended June 30, 2009 and Form 10-Q for the quarter ended September 30, 2009 by April 30, 2010. KPMG on April 19, 2010 told the Audit Committee Chair and management that it was highly unlikely that KPMG would be in a position to complete its reviews of the quarterly financial information and its audit of the consolidated 2009 financial statements by April 30, 2010.

## Defendants' Illegal Insider Sales

65.    Defendant Pocras took full advantage of her position as a Director of the Company while misleading the investing public. During the Relevant Period and while in possession of material undisclosed information, Defendant Pocras sold personally held shares of TierOne stock. Defendant Pocras's stock sales were suspicious as to both the timing and amount in comparison to Defendant's historical TierOne trading activity.

Indeed, during the Relevant Period, Defendant Pocras sold 22,560 shares of her TierOne stock for which she received $72,520 in proceeds.

66.    During the Relevant Period and while in possession of material undisclosed information, Defendant Laphen sold personally held shares of TierOne stock. Defendant Laphen's stock sales were suspicious as to both the timing and amount in comparison to Defendant's historical TierOne trading activity. Indeed, during the Relevant Period, Defendant Laphen sold 6,919 shares of his TierOne stock for which he received $62,686 in proceeds.

**The Individual Defendants Breached Their Fiduciary Duties**

67.    The Individual Defendants knew that the Company's loan underwriting, internal accounting and financial reporting controls were ineffective. The Individual Defendants' failure to ensure effective controls at TierOne resulted in the Company taking on undisclosed risky loans, understating loan loss reserves and thereby materially overstating the Company's financial results.

68.    The Individual Defendants received numerous reports regarding problems with the Company's lending, accounting and reporting practices and internal controls. Through their receipt of weekly, monthly, and quarterly reports, attendance at Board and Committee meetings, review of the Company's financial statements, and conversations with the Company's management, internal auditors, and external auditors, the Individual Defendants knew that TierOne granted risky loans and that its accounting and reporting practices were improper, and its internal controls were materially deficient.

69.    In breach of their fiduciary duty of good faith and loyalty, the Individual Defendants willfully ignored the obvious and pervasive problems in connection with their

improper lending practices and TierOne's accounting and internal control practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. The material non-public information discussed above was well-known among TierOne insiders, including the Individual Defendants.  The Individual Defendants knew of TierOne's illegal practices, which were discussed formally and informally during Company Board and committee meetings, management meetings, and other meetings attended by the Individual Defendants. Indeed, the Individual Defendants were clearly aware that the Company did not follow proper procedures and policies which lead to TierOne's risky practices.

70.    As such, during the Relevant Period, the Individual Defendants, especially the Audit Committee, knowingly caused the Company to make a series of false and misleading statements. Furthermore, the Individual Defendants knowingly made a series of false and misleading statements concerning the condition of the Company's internal controls, materially misrepresenting that the Company maintained sound internal controls and was able to regulate its business in accordance with applicable laws and regulations. Furthermore, the Individual Defendants engaged in improper lending practices knowing that it would and did cause harm to the Company and subjected the Company to costs, fines, and other damages associated with their unlawful and improper business practices.

**The Individual Defendant's False and Misleading Statements**

71.    The Individual Defendants, with knowledge of their improper business practices, made false and misleading representations about TierOne's business performance, providing artificially inflated financial results, quarter after quarter and year after year.  They knowingly failed to disclose to TierOne and its shareholders that the

Company's purportedly outstanding financial performance and continual improvements were due to the undisclosed and unreported loan impairment and material understated loan loss reserves. Furthermore, the Individual Defendants knew that their misconduct was illegal and unsustainable.

## DEMAND REFUSED ALLEGATIONS

72.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law. As a result of the Individual Defendants' misconduct, TierOne has sustained damages, including, but not limited to, costs and expenses incurred in connection with the legal action taken against TierOne by the Office of the Thrift Supervisor and further investigation of the Company's unethical and illegal activities.

73.     Plaintiff is an owner of TierOne common stock and was an owner of TierOne common stock at times relevant hereto.

74.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights

75.     On March 5, 2009, Plaintiff made a demand on the Board to fully investigate and remedy, *inter alia*, breaches of fiduciary duty by certain current and/or former officers, directors and management of the Company (the "Demand").

76.     On March 30, 2009, counsel for TierOne sent to Plaintiff's counsel a letter acknowledging receipt of the Demand and requested additional information regarding the Demand, which Plaintiff provided on May 20, 2009.

77.     On September 24, 2009, TierOne denied Plaintiff's demand advising that the special litigation committee determined that commencing derivative proceedings

based on the claims asserted in Plaintiff's demand letter would not be in the best interests of TierOne. Plaintiff believes that the special litigation committee's conclusion lacks objectivity and validity given the overwhelming evidence that the Individual Defendants' breached their fiduciary duties to the Company and further given the recent developments affecting TierOne, including the mass exodus of directors on March 30, 2010 in which all three of the members of the special litigation committee and the then CEO resigned. Accordingly, Plaintiff seeks to exercise his shareholder rights by bringing this derivative action against the Individual Defendants in order to sustain a recovery for the benefit of the Company.

## FIRST CAUSE OF ACTION

### Against All Individual Defendants for Breach of Fiduciary Duty

78.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

79.    As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

80.    The Individual Defendants knowingly implemented and engaged in the Company's improper business practices, breaching their fiduciary duties.

81.    Furthermore, despite their actual knowledge of the Company's improper business practices, the Individual Defendants made no effort to correct the problems or

prevent their recurrence; thus, they abdicated their fiduciary duty of good faith.

82.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages, including, but not limited to, it risky loan practices.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants for Abuse of Control

83.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

84.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability of control and influence TierOne, for which they are legally responsible.

85.     As a direct and proximate result of the Individual Defendants' abuse of control, TierOne has sustained significant damages.

86.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

87.     Plaintiff, on behalf of TierOne has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against the Individual Defendants for Gross Mismanagement

88.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

89.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of TierOne in a manner consistent with the operations of a publicly held corporation.

90. As direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, TierOne has sustained significant damages in excess of millions of dollars.

91. Plaintiff, on behalf of TierOne, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### Against the Individual Defendants for Waste of Corporate Assets

92. Plaintiff incorporates by references and realleges each and every allegation set forth above as if set forth fully herein.

93. As result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused TierOne to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

94. As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

95. Plaintiff, on behalf of TierOne, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against the Individual Defendants for Unjust Enrichment

96. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

97. By his wrongful acts and omission, the Individual Defendants were unjustly enriched at the expense of and to the detriment of TierOne.

41

98.     Plaintiff, as shareholder and representative of TierOne, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

### SIXTH CAUSE OF ACTION

#### Against Defendants Pocras and Laphen for Insider Selling

99.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

100.    At the time of Defendants' stock sales set forth herein, Defendants Pocras and Laphen knew the information described above and sold TierOne common stock on the basis of such information.

101.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold TierOne common stock.

102.    Defendants' sale of TierOne common stock, while in possession and control of this material adverse non-public information was a breach of their fiduciary duty of loyalty and good faith.

103.    Since they used the Company's proprietary information for their own gain, this constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits Defendants obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.      Against the Individual Defendants in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C.      Awarding to TierOne restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial in the United States District Court for the District of Nebraska, located in Lincoln, Nebraska.

Dated this 28th day of May, 2010.

CURTIS W. ACTON, Derivatively on
Behalf of Nominal Defendant TIERONE
CORPORATION, Plaintiff

BY:    William B. Federman
FEDERMAN & SHERWOOD
10205 North Pennsylvania Avenue
Oklahoma City, OK 73120
(405) 235-1560
(405) 239-2112 (Fax)

And:

Marc S. Henzel, Esq.
LAW OFFICES OF MARC HENZEL
273 Montgomery Avenue, Suite 202
Bala Cynwyd, PA 19004
(610) 660-8000
(610) 660-8080 (Fax)

And:

FRIEDMAN LAW OFFICES
Attorneys for Plaintiffs
3800 Normal Blvd., Suite 200
PO Box 82009
Lincoln, NE 68501
(402) 476-1093

*/s/ Herbert J. Friedman*
Herbert J. Friedman, #11390
hfriedman@friedmanlaw.com

44